**STATE ex rel. Joseph LUKAS,
Appellant,**

v.

**The CITY OF SIKESTON, Missouri, et
al., Respondents.**

**No. 13058.**

Missouri Court of Appeals,
Southern District,
Division Three.

March 1, 1984.

Motion for Rehearing or Transfer
Denied March 23, 1984.

Application to Transfer Denied
May 15, 1984.

David L. Baylard, Briegel & Dempsey, P.C., Union, for appellant.

Daniel S. Norton, Norton & Winchester, Sikeston, for respondents.

CROW, Presiding Judge.

Appellant ("Lukas") asserts the City of Sikeston unlawfully discharged him from employment, in that his dismissal was not preceded by a public hearing before the personnel board. The trial court granted Lukas no relief. We affirm.

Sikeston, a city of the third class, adopted the city manager form of government in 1959.[1]

In 1979, the Sikeston City Council, by ordinance, created a department of public

safety, and charged it with the duties and responsibilities of the police and fire departments.[2] The distinction between police officers and firemen was abolished, and their duties and responsibilities were combined in the persons of public safety officers.[3] The office of director of public safety ("director") was created. The director was made chief of police and chief of the fire department, and was assigned the duties of both positions.[4] The director is selected and appointed by, and serves at the pleasure of, the city manager.[5]

Lukas, who became a Sikeston employee in 1978, was a public safety officer at the time of the events that spawned this litigation. He was assigned to field operations in the public division of the department of public safety, and was primarily involved in law enforcement duties, while at the same time performing some duties ordinarily performed by firemen.

By letter of May 3, 1982, the director notified Lukas that a "Board of Inquiry" would be held four days hence to examine allegations that Lukas had violated certain departmental rules and regulations. The letter included this paragraph:

The Inquiry Board is a recommending body and conducts closed administrative hearings as an extension of the City of Sikeston's management rights and as such is not a court of law. Therefore, legal representation will not be allowed to attend the hearings.

The letter commanded Lukas to be present, and warned that failure to answer the allegations could result in his dismissal.

The Board met as scheduled, Lukas attending. The Board found Lukas guilty of

---

**1.** Statutes enabling cities of the third class to establish that form of government appear in RSMo 1978 as §§ 78.430–.640.

**2.** § 2.32.010, City Code of Sikeston, 1981 (hereafter "C.C.S."), provides:
There is created and established the department of public safety for the city. The department of public safety shall perform all of the duties and responsibilities of both the police and fire departments of the city and shall have all the powers, duties and responsibilities conferred upon the police and fire de-

partments by virtue of the municipal code of the city or other ordinances of this city, or by state law, and shall have such other and additional powers, duties and responsibilities as may be lawfully imposed upon it by any administrative directive, resolution, rule, ordinance or law.

**3.** § 2.32.020, C.C.S.

**4.** § 2.32.030, C.C.S.

**5.** *Id.* n. 4.

three violations and recommended that he be dismissed immediately. The director concurred.

The city manager reviewed the case and agreed with the recommendation of the Board and the director. By letter of May 10, 1982, the city manager notified Lukas that he was dismissed from the department of public safety and from employment by Sikeston, effective immediately.

Two days later, Lukas, through counsel, formally requested a "proper hearing as required by Missouri law," to be conducted "pursuant to all rules and regulations and be governed by the Administrative Procedure Act." Lukas demanded that "formal charges and specifications be filed," that he be accorded "pretrial or prehearing discovery rights," and that he be represented by counsel. Sikeston's city attorney responded by advising Lukas' attorney that all requests and demands were denied. Lukas' dismissal remained in effect.

Thereafter, Lukas commenced this action seeking a writ of mandamus to compel Sikeston to reinstate him, with back pay, and "to hold a public hearing conducted in compliance with Chapter 536, RSMo," in the event his superiors wished to suspend, demote or discharge him.

The trial court issued a preliminary order in mandamus, but ultimately, after an evidentiary hearing, denied relief. This appeal followed.

Lukas bases his case on § 85.541,[6] which authorizes any city of the third class to adopt—by ordinance—a merit system police department. Any ordinance adopting that type department must include certain provisions regarding appointment, promotion, suspension, demotion or discharge of its members. § 85.541.2. Among other requirements, a personnel board must be created, and any officer suspended, demoted or discharged for misbehavior or inefficiency is, upon application, entitled to a public hearing before the personnel board. § 85.541.2(5).

Lukas asserts that Sikeston, in establishing its department of public safety, adopted a merit system police department as a matter of law; consequently, he was entitled to a "public hearing before the personnel board" before he could be lawfully discharged.

In support of this theory, Lukas points to evidence that Sikeston's public safety officers carry the responsibilities and exercise the authority of police officers, including the powers of arrest, search and seizure and "police protective powers." Persons seeking appointment as a public safety officer must take written examinations, undergo a physical test, and be interviewed by a board. Promotion is based on further examinations, performance record and tenure. These characteristics, says Lukas, render Sikeston's department of public safety a *de facto* merit system police department.

Moreover, argues Lukas, Sikeston is required by law to have either a merit system police department or a police department headed by an elected marshal. Lukas bottoms this hypothesis on § 85.551.1, which provides that in cities of the third class that have not adopted a merit system police department, the marshal shall be the chief of police.[7] Sikeston's governmental structure does not include the office of marshal. Therefore, reasons Lukas, Sikeston must be deemed to have adopted a merit system police department by operation of law.

A study of the legislative history of § 85.551 has led us to conclude that it does not apply to Sikeston.

---

**6.** Henceforth, references beginning with "§" are to RSMo 1978, unless otherwise indicated.

**7.** § 85.551.1 states:
In cities of the third class which shall not have adopted the merit system police department provided for in sections 85.541 to 85.-571, the marshal shall be the chief of police, and there also may be one assistant marshal, who shall serve for a term of one year and who shall be deputy chief of police; such number of regular policemen as may be deemed necessary by the council for the good government of the city, who shall serve for terms of one year; and such number of special policemen as may be prescribed by ordinance, to serve for such time as may be prescribed by ordinance.

Section 85.551, along with § 85.541 (the section authorizing merit system police departments) and two other sections, 85.561 and 85.571, appear in that part of chapter 85, RSMo 1978, designated "Provisions Applicable to Third Class Cities." Chapter 85, captioned "City Police and Fire Departments, Generally," also contains provisions applicable to first class cities and fourth class cities.

The four sections identified above, 85.-541–.571, were enacted in the same bill, H.B. 40, Laws 1955, p. 290.

Prior to H.B. 40, cities of the third class, unless they opted for one of the two permissible alternative forms of government described *infra*, were governed pursuant to chapter 77, RSMo 1949. The governmental structure provided by chapter 77 included an elected council, an elected mayor, and sundry other elected officers, including a marshal. § 77.370, RSMo 1949. Before H.B. 40, there was no statute authorizing a city of the third class with a chapter 77 form of government to establish a merit system police department. The marshal was the chief of police (§ 85.540, RSMo 1949), and the police department could include an assistant marshal (§ 85.-550, RSMo 1949) and such number of regular policemen as the council deemed necessary (§ 85.560, RSMo 1949), to be appointed in the manner defined by ordinance. (§ 85.570, RSMo 1949).

However, at the time H.B. 40 was enacted, a city of the third class was not compelled to have a chapter 77 form of government. Such cities had the option under chapter 78, RSMo 1949, of adopting a commission form of government (§§ 78.-010–.420, RSMo 1949), or a city manager form of government (§§ 78.430–.640, RSMo 1949). There was no provision requiring establishment of a police department in third class cities adopting the commission form of government; instead, a department of public safety was to be established. § 78.060.1, RSMo 1949. There was likewise no provision for a police department in third class cities adopting the city manager form of government, and the office of mar-

shal was not there mentioned. The council was required to appoint a city manager, city clerk, city assessor and city treasurer. § 78.600, RSMo 1949. The council was authorized to provide for all other necessary offices and positions. § 78.570.2, RSMo 1949.

Inasmuch as (a) cities of the third class with a chapter 77 government were required to elect a marshal prior to H.B. 40, and (b) the office of elected marshal was repugnant to a merit system police department, it was necessary that H.B. 40 provide, in some manner, that cities adopting a merit system police department should not elect a marshal. Additionally, there were other statutes in RSMo 1949 inharmonious with merit system police departments. They concerned such areas as fixing compensation, terms of employment, chain of command and disciplinary procedures.

Accordingly, a provision was included in H.B. 40 repealing the statute that required election of a marshal (§ 77.370, RSMo 1949), and enacting a new statute, similarly numbered, requiring the election of a marshal "...except in cities which may adopt the merit system police department...." H.B. 40 also included a provision repealing the statute that authorized the city council to fix the compensation of all officers and employees (§ 77.440, RSMo 1949), and enacting a new statute, similarly numbered, reaffirming that power "...except as to personnel of a merit system police department whose salary schedules may be revised by the council upon recommendation of the personnel board...."

H.B. 40 included another section repealing certain other statutes (§§ 85.540–.600, RSMo 1949) containing provisions hostile to merit system police departments, and enacting three new statutes dealing with many of the same subjects in a manner that would not conflict with merit system police departments. Section 85.540, RSMo 1949, one of the statutes repealed by H.B. 40, provided: "The marshal in cities of the third class shall be chief of police...." Section 85.551.1, one of the statutes enacted by H.B. 40 (and the one on which Lukas' argument hinges), provides, as we have observed: "In cities of the third class

which shall not have adopted the merit system police department provided for in sections 85.541 to 85.571, the marshal shall be the chief of police...."

There is no reference in H.B. 40 to chapter 78, RSMo 1949, or to police departments in cities of the third class with a commission form of government or a city manager form of government. The statutes repealed by H.B. 40 were, as already noted, in chapters 77 and 85.

■ It is therefore evident to us that the purpose of § 85.551.1 was not to compel cities of the third class with one of the two optional forms of government under chapter 78 to choose between a merit system police department and an "elected marshal" police department. Rather, its purpose was to eliminate conflicts between the statutes pertaining to marshal-type police departments in chapter 77 third class cities and the statute authorizing establishment of merit system police departments.

■ We therefore hold that Sikeston, a city of the third class with city manager government under chapter 78, RSMo 1978, is not subject to § 85.551, and is not required to choose between a merit system police department and a marshal-type police department.[8] In so holding, we have not overlooked *Ried v. City of Maplewood,* 598 S.W.2d 171 (Mo.App.1980), cited by Lukas. *Ried* indicates, in broad terms, that cities of the third class that do not adopt a merit system police department are governed by § 85.551. We agree with *Ried* insofar as chapter 77 third class cities are concerned. We do not agree, however, with respect to chapter 78 third class cities. Such a holding would be contrary to the legislative history of § 85.551, and would hobble chapter 78 third class cities in structuring their police departments (or departments of public safety) to fit their individual needs. Our conclusion is buttressed by

the absence of any provision in §§ 78.-430–.640 [9] requiring cities of the third class with city manager government to establish police departments, or to organize them in any particular way.

■ We likewise reject Lukas' argument that Sikeston has a *de facto* merit system police department. One requirement for that type department is a personnel board, created by ordinance and composed of members of the largest and second largest political parties in equal numbers. § 85.-541.2(1). Sikeston has not created any such board by ordinance. When a Sikeston public safety officer is accused of misconduct, a board of inquiry is appointed pursuant to departmental regulations and practice. Such board is composed of officers of the department of public safety, not private citizens.

Additionally, any ordinance adopting a merit system police department must provide that any department member may, upon his application, be granted a public hearing before the personnel board if suspended, demoted or discharged for misbehavior or inefficiency. § 85.541.2(5). Sikeston has no such ordinance.

Lukas' argument that Sikeston, by reason of the manner in which it operates its department of public safety, is in fact running a merit system police department, is without merit.

The Sikeston city manager testified without contradiction that he appoints and dismisses officers of the department of public safety, and that there are no ordinances providing for anyone other than him to do so. Discharging such officers is within the city manager's statutory authority. § 78.-600.

■ Lukas does not contend that Sikeston, in dismissing him, violated any contract of employment or any statutory provi-

---

**8.** We do not imply that Sikeston may not choose one of those types.

**9.** There is no doubt that these are the statutes under which the Sikeston city government is established. § 1.08.010, C.C.S. provides:

The city of Sikeston, Missouri, a city of the third class, organized under the provisions of

Sections 78.430 through 78.640 of the Missouri Revised Statutes, 1978, as amended, shall employ the council-manager form of government, whereby the duly elected city council serves as the legislative body and their appointee, the city manager, serves as administrative head.

sion other than those pertaining to merit system police departments. In Missouri, the rule is well established that in the absence of a contract for employment for a definite term or a contrary statutory provision, an employer may discharge an employee at any time, without cause or reason, or for any reason, and, in such cases, no action can be obtained for wrongful discharge. *Amaan v. City of Eureka,* 615 S.W.2d 414, 415[1] (Mo. banc 1981); *Cooper v. City of Creve Coeur,* 556 S.W.2d 717, 721[5] (Mo.App.1977). Both *Amaan* and *Cooper* involved discharge of police officers.

■ On the record before us, we hold that Sikeston, acting through its officials as it did, had the right to terminate Lukas' employment without a public hearing.

Judgment affirmed.

GREENE, C.J., and FLANIGAN, MAUS and PREWITT, JJ., concur.