In re HARCO ENERGY, INC., Debtor.

Harco Energy, Inc., Plaintiff,

v.

Anadrill, a Division of Schlumberger Technology Corp., Defendant.

Bankruptcy No. 00–32095–SAF–7.
Adversary No. 00–3364.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Oct. 4, 2001.

Gary Vodicka, Irving, TX, for Jackie Hanners, et al.

J. Robert Forshey, Forshey & Prostok, Ft. Worth, TX, for D.A. Loveless.

Tammy S. Wood, Bell, Nunnally & Martin, Dallas, TX, W. Ray Whitman, Baker & Hostetler, LLP, Houston, TX, for Anadrill.

W.D. Masterson, Kilgore & Kilgore, Dallas, TX, for Daniel Sherman, Chapter 7 Trustee.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

In this bifurcated adversary proceeding, the court must determine whether the underlying disputes among the parties had been resolved by an enforceable settlement agreement prior to the filing of a bankruptcy petition by Harco Energy, Inc., the debtor.

In 1995, Anadrill, a division of Schlumberger Technology Corporation (which for ease of reference this court refers to as Anadrill) filed a lawsuit against Harco Land, Inc., in the 191st Judicial District Court of Dallas County, Texas, case no. 95–11150–J. Anadrill added as other defendants Harco Energy, Inc., R.F. Thomas, Terry Buck, Prime Western Development, Tango Investments Larry Cotten,

and Doris A. Loveless. Anadrill also added Jackie Hanners, Myra Sue Hanners, Lisa Ann Hill f/k/a Hanners, Jana Sue Turner f/k/a Hanners, Ronnie Lynn Hanners, Jr., and Jason Hanners (collectively, the "Hanners") as defendants. Anadrill sought collection of invoices for drilling services and materials provided to two wells in Hardeman County, Texas. Subsequently, Harco Land, Inc., counterclaimed alleging that Anadrill had negligently provided drilling services on one of the wells.

Harco, Loveless, and the Hanners filed a separate lawsuit against Anadrill in the 46th Judicial District Court of Hardeman County, Texas, alleging negligent performance and deceptive trade practices. The First State Bank of Mesquite intervened in the Hardeman County lawsuit, asserting a security interest in any recovery. Cotten and others joined as third party defendants.

On February 14, 2000, the state court called the Hardeman County lawsuit for trial. Although the court had the jury panel ready, the parties announced a settlement, which the court accepted.

On March 29, 2000, Harco filed a petition for relief under Chapter 11 of the Bankruptcy Code. Subsequently, Harco removed both lawsuits to this court. However, prior to removal, Sparkman & Davison, L.L.P., and Stanley R. Watson, P.C., the state court attorneys for Harco and for the Hanners intervened as parties in the Hardeman County lawsuit. The Dallas County litigation is adversary proceeding no. 00–3319, while the Hardeman County litigation is the instant adversary proceeding no. 00–3364. On July 24, 2000, Harco filed a motion under Bankruptcy Rule 9019 to approve the settlement agreement. That motion triggered various disputes.

On January 8, 2001, the court converted the Harco bankruptcy case to a case under Chapter 7 of the Bankruptcy Code. The United States Trustee appointed Daniel Sherman as the interim trustee. The trustee intervened in the adversary proceedings.

On February 14, 2001, the state court attorneys filed a supplemental complaint seeking a declaration that a binding settlement had been entered pre-petition. Meanwhile, the debtor, the bank, and the trustee questioned whether a binding settlement had been entered and, if so, whether it could be rejected as an executory contract under 11 U.S.C. § 365. This court determined that the existence of an enforceable settlement for consideration under Bankruptcy Rule 9019 and § 365 constituted a threshold issue for adjudication. With the trustee's intervention, all parties to the disputes are also parties in this adversary proceeding. The court directed that the issue be joined to the instant adversary proceeding. Fed.R.Civ.P. 42(a), made applicable by Bankruptcy Rule 7042. The court further directed that the issue be bifurcated for trial. Fed.R.Civ.P. 42(b). On March 19, 2001, the court entered a scheduling order for the bifurcated issue.

On June 28, 2001, the trustee filed a motion for summary judgment asking for a declaration that the parties do not have an enforceable settlement. Anadrill and the state court attorneys oppose the motion. On July 13, 2001, the bank filed its motion for summary judgment, contending that the parties had not entered an enforceable settlement. Additionally, on July 13, 2001, royalty owners Jana Turner, Lisa Hill, Ronnie Hanners, and Jason Hanners filed a motion for summary judgment. They assert that they had neither consented to nor authorized their attorneys to enter a settlement before the state court. Also, on July 13, 2001, Jackie Hanners and Myra Sue Hanners filed a motion for summary judgment, joining in the bank's and the

other Hanners' position. The state court attorneys and Anadrill oppose all three motions.

Moreover, on July 13, 2001, the state court attorneys filed a motion for summary judgment requesting a declaration that the parties do have an enforceable settlement. Additionally, on July 13, 2001, Anadrill filed a motion for summary judgment requesting a declaration that a binding and enforceable settlement agreement exists, and arguing that the Hanners' allegations are immaterial. The bank and the Hanners oppose those motions.

On August 7, 2001, Anadrill filed an objection to and a motion to strike the bank's and the Hanners' responses to Anadrill's motion for summary judgment. On August 7, 2001, the state court attorneys filed a motion to strike the bank's and the Hanners' responses to their motion for summary judgment.

The court conducted a hearing on the motions for summary judgment on August 8, 2001. The court has exclusive jurisdiction over Harco's interest in the litigation. 28 U.S.C. § 1334(e). The determination of the existence of an executory contract is a core matter over which this court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(A) and 1334.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and other matters presented to the court show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988). On a summary judgment motion

the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A factual dispute bars summary judgment only when the disputed fact is determinative under governing law. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

The movant bears the initial burden of articulating the basis for its motion and identifying evidence which shows that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The respondent may not rest on the mere allegations or denials in its pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court applies the same standards to the cross-motions for partial summary judgment.

### Pleadings

Anadrill and the state court attorneys filed their motions for summary judgment on July 13, 2001. Under the local rules, the bank's and the Hanners' responses should have been filed by August 2, 2001. L.B.R. 7007.1, L.R. 7.1(e), L.R. 56.1. However, the bank and the Hanners' filed their responses on August 6, 2001. Although already late, the bank and the Hanners did not deliver their responses to Anadrill and the state court attorneys on August 6, 2001. Rather, the bank and the Hanners served their responses by mail. Consequently, Anadrill and the state court attorneys did not receive the responses until August 7, 2001. The court conducted its hearing on the motions on August 8, 2001.

Anadrill and the state court attorneys move to strike the bank's and the Hanners' responses to their summary judgment mo-

tions. Anadrill and the state court attorneys complain that they could neither timely nor adequately address the issues and evidence presented in the responses.

■ This court could grant the motions to strike. Bankruptcy Rule 9006(f) does not apply because the response time under the local rule runs from the date of filing and not from the date of service. Consequently, the bank and the Hanners may not add three days to the prescribed period. Therefore, the responses are not timely.

Moreover, Anadrill and the state court attorneys lacked sufficient time to fairly address all of the issues and evidence presented with the responses. The bank and the Hanners knew or should have known that service of the responses by mail on August 6, 2001, would result in, at best, one day for Anadrill and the state court attorneys to consider and reply to the responses.

This analysis and conclusion notwithstanding, the court has nevertheless considered the responses and the summary judgment evidence submitted with the responses. As explained below, Anadrill and the state court attorneys prevail on their motions for summary judgment even with consideration of the bank's and the Hanners' responses. For pragmatic reasons, therefore, the court does not strike the responses.

### Texas Rule 11

### In Open Court

■ Texas jurisprudence favors the settlement of lawsuits. *Padilla v. LaFrance,* 907 S.W.2d 454, 461 (Tex.1995). "Agreements and stipulations are welcomed by courts because they limit the matters in controversy and expedite trial proceedings." *Kennedy v. Hyde,* 682 S.W.2d 525, 530 (Tex.1984). While recognizing a public policy favoring settlements,

the Texas Supreme Court has also recognized "the need for reasonable safeguards on the settlement process." *Kennedy,* 682 S.W.2d at 530.

■ Accordingly, to be enforceable a settlement must "be in writing, signed and filed with the papers as part of the record, or ... be made in open court and entered of record." Tex.R. Civ. P. 11. "A settlement agreement must comply with Rule 11 to be enforceable." *Padilla,* 907 S.W.2d at 460. "Rule 11 ensures that [settlement] agreements do not themselves become sources of controversy, impeding resolution of suits. The requirements of Rule 11 are not onerous; the benefits are substantial." *Kennedy,* 682 S.W.2d at 530. As an alternative to a written, signed, and filed settlement agreement, Texas jurisprudence has recognized the legitimacy of an agreement made in open court and entered of record for over a century. *Kennedy,* 682 S.W.2d at 526 n. 1.

■ The court must determine whether, on this summary judgment record, the parties entered an enforceable settlement under Rule 11. The parties have presented substantial summary judgment evidence of written and oral communications, which the court addresses below. But the proceedings before the state court on February 14, 2000, establishes compliance with the Rule 11 requirement. Therefore, as a matter of law, the parties entered into an enforceable agreement.

This court reviews the proceedings before the 46th Judicial District Court of Hardeman County, Texas, in the case of *Harco Energy, Inc. v. Anadrill, a division of Schlumberger Technology Corporation,* case no. 9065.

On February 14, 2000, the state court called the case for trial. At that time, a jury panel was present and ready to proceed. However, outside of the jury panel's

presence, the bank's counsel, Gary Vodicka, announced to the court that the case had been settled. Plaintiffs' counsel, Roy Sparkman, raised an issue of the allocation of settlement proceeds among the plaintiffs. He also indicated that he may have lacked the consent of one of his clients. Anadrill's counsel insisted that all of the parties had to agree to the settlement. After a brief colloquy on these matters, the court asked the parties whether it should call the jury panel into the courtroom and start the trial or whether they had reached a settlement. The bank's counsel, Vodicka, responded that Harco, the bank, and Anadrill had settled for a specified but confidential amount of money, releases, and dismissals with prejudice of that case, as well as the case pending in Dallas County. But, plaintiffs' counsel, Sparkman, continued to express a concern about his authority to settle on behalf of one of his clients. In an attempt to allow the parties to resolve the outstanding question, the court recessed.

After the recess, the court formally called the case. Counsel entered appearances for all of the parties of record. Plaintiffs' counsel, Sparkman, in open court and on the record, stated: "Your Honor, we would announce that the parties have reached an agreement with the Defendant, Anadrill, for an amount that is to remain confidential, subject to execution of satisfactory releases, dismissals of all claims and dismissal of what the parties have referred to as the Dallas County lawsuit." Anadrill's counsel agreed. Counsel for the third party defendants, who were also defendants in the Dallas County lawsuit, agreed. The bank's counsel, Vodicka, agreed. The terms of the agreement having been stated in open court and on the record, the court held: "It will be the order of the court that the settlement announced by the parties should be and it is hereby and here and

now approved and judgment rendered on the same." With that pronouncement, the settlement agreement was made in open court and entered of record. The requirement of Rule 11 having been met, under Texas law, the parties had entered an enforceable settlement agreement.

The trustee, the bank, and the Hanners contend that the terms had not been complete. As a matter of law, that argument fails. The parties announced the essential elements of the agreement in open court and on the record. Consequently, the agreement can be ascertained from the record without resort to oral testimony. *Padilla,* 907 S.W.2d at 460 (explaining requirements for written agreement). Simply stated, the essential terms of the settlement agreement are: (1) Anadrill pays the plaintiffs a specific amount of money, which the parties requested be kept confidential and the court agreed; (2) the plaintiffs agreed to accept that amount; (3) the parties would execute releases; and (4) the two lawsuits would be dismissed with prejudice.

The trustee and the Hanners also argue that, at most, the parties only agreed to execute a formal settlement agreement. The trustee and the Hanners have premised their positions on the exchange of written papers by the parties. They have interpreted those papers as creating a condition precedent argument. However, a reasoned reading of the transcript of February 14, 2000, does not support that argument. The essential terms of the settlement recited in open court, and accepted by the court, do not require a formal written settlement document as a condition precedent to a settlement. The parties did not tell the court, "Judge, once we have executed formal settlement documents, we will have settled the case." Therefore, once the Rule 11 requirements had been met in open court, the lawsuit was settled.

Consequently, the trustee's version of events, derived from activities outside the courtroom, cannot undermine or re-script what occurred in court.

The trustee refers the court to summary judgment evidence regarding the parties' actions after February 14, 2000. This court recognizes the document drafting and other actions of the parties and their counsel after the February 14, 2000, hearing. Lawyers' efforts to paper a settlement for the benefit of their clients do not supercede the enforceability of the settlement made in open court and on the record. Contrary to the trustee's arguments, those actions matter not. Moreover, as the state court attorneys and Anadrill contend, the court need not consider the written papers for Rule 11 purposes because the parties made a settlement in open court which the court entered on the record. Once that occurred, for Rule 11 purposes, the written papers became superfluous. Therefore, the state court, at any time after that hearing, could have enforced the obligations: (1) for Anadrill to pay the agreed amount; (2) for the parties to execute releases; and (3) for the dismissal with prejudice of the two law suits.

Indeed, the parties behavior after February 14, 2000, demonstrates the public policy reason for court enforcement of settlement agreements that have been made in open court and entered of record. With the jury panel pacing in the courthouse waiting for either the commencement of the trial or their release, the parties chose to announce a settlement in open court. Parties to a lawsuit cannot make a settlement in open court, have the court enter it on the record, avoid a trial, and then through their machinations or drafting avoid the enforceability of the settlement. To allow that conduct would undermine the integrity of the proceedings before the state court, while disrupting the sound and efficient administration of justice. Rule 11 implements the Texas public policy favoring settlements. Enforcement of a settlement, which complies with Rule 11, assures that parties may not undermine Texas' public policy due to post-settlement disputes, drafting, or implementation difficulties.

The bank and the Hanners further contend that the execution of the releases is also a condition precedent to the settlement. Vodicka represented the bank before the state court on February 14, 2000, and he represents the bank in this adversary proceeding. Prior to the formal announcement and acceptance of the settlement, Vodicka informed the state court, on the record, that the parties had settled. He then recited the essential terms of the settlement. Subsequently, the state court asked Vodicka: "And your party does agree to the settlement." Vodicka responded, "That Anadrill has made, yes, Your Honor." Thus, the bank is estopped from asserting that the parties did not enter a settlement. A party cannot announce to a court, on the record, that it has agreed to a settlement with the essential terms made in open court and entered on the record, and then contend that the parties had not reached a settlement. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205–06 (5th Cir.1999)(determining that the doctrine of judicial estoppel prevents a party who has assumed one position before a court from assuming an inconsistent position); *Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292, 295 (1956); *Washburn v. Associated Indem. Corp.*, 721 S.W.2d 928, 931–32 (Tex.App.—Dallas [5th Dist.] 1986, writ ref'd n.r.e.).

Conversely, even though they are represented by Vodicka in this adversary proceeding, the Hanners are not estopped by the bank's actions. Consequently, the

court addresses their condition precedent argument. Plaintiffs' counsel, Sparkman, told the court that the parties had reached an agreement with Anadrill for an amount of money that was to remain confidential, "subject to execution of satisfactory releases." The Hanners contend that satisfactory releases must be executed as a condition precedent to the entry of an enforceable settlement.

■■■■ Under Texas law, a condition precedent may act as a condition to the formation of a contract or may relate to liability or performance under a contract. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976). The court may not read the terms announced on the record to impose an absurd result. *Id.* In this case, the parties did not walk into court with drafted, executed releases. Rather, they agreed that as a term of the settlement, they would execute satisfactory releases. Therefore, until the parties executed the releases, Anadrill had no obligation to pay the agreed amount. The parties stated a condition to payment under the settlement agreement, not a condition to the entry of a settlement agreement. If it were otherwise, then they would have objected on the record. They also would have told the court that they either could not or would not settle until they had executed releases. Therefore, the parties would not have had a settlement for the record, and the court could not have accepted a settlement. Instead, the court would have likely brought in the jury panel and proceeded to trial, as the court had suggested. However, that is not what happened.

The court reiterates that even though the parties had exchanged written proposals, the contents of those writings became irrelevant when the parties chose the alternate route, under Rule 11, of announcing their settlement in open court with the court entering it on the record, as evidenced by the transcript of the proceedings. Consequently, rather than acting as a condition precedent, the execution of those writings served to memorialize an existing enforceable agreement.

### Authorization

Jana Turner, Lisa Hill, Ronnie Hanners, and Jason Hanners are the grown children of Myra Sue Hanners. Jackie Hanners is Myra Sue Hanners' brother-in-law and the children's uncle. Sparkman & Davison, L.L.P., and Stanley R. Watson, P.C., represented all of them in the litigation with Anadrill.

The trustee and the Hanners contend that the Hanners neither consented to nor authorized the settlement on February 14, 2000. The state court attorneys argue that they had the consent and authorization of all of their clients to enter the settlement. But, they maintain, that even if they lacked consent from one or more of the Hanners, the Hanners' subsequent actions ratified the settlement made in open court and entered on the record on February 14, 2000.

■■■■ A lawyer must have the consent of his client to settle a lawsuit. Tex. State Bar. R. art. X, § 9, *reprinted* in Tex. Gov't Code Ann., tit. 2, subtit. G app. (Vernon 1995); Tex. Disciplinary R. Prof'l Conduct 1.02(a)(2), *reprinted* in Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon Supp.1997) (Tex. State Bar. R. art. X, § 9). Absent the client's consent, a settlement would not be enforceable. *Cleere v. Blaylock*, 605 S.W.2d 294, 296 (Tex.Civ.App.—Dallas 1980, no writ). But, Texas courts indulge every reasonable presumption in favor of a settlement made by an attorney duly employed, especially after accepted by a court. *Williams v. Nolan*, 58 Tex. 708, 713 (Tex.1883); *Webb v. Webb*, 602

S.W.2d 127, 129 (Tex.Civ.App.—Austin [3rd Dist.] 1980, no writ).

 On February 14, 2000, in open court, Sparkman, the Hanners' attorney, told the court that the parties had settled. If an attorney represents a party, then he is presumptively authorized to take all actions necessary to conduct that litigation. Therefore, a court may rely on the representation of the counsel of record that his clients agree to a settlement. Consequently, the Hanners bear the burden of establishing that their counsel lacked authority to enter the settlement and present the settlement to the court. *Walden v. Sanger*, 250 S.W.2d 312, 316 (Tex.Civ. App.—Austin 1952, no writ).

According to Sparkman's affidavit, the lawyers understood that Myra Sue Hanners would speak on behalf of her children. Therefore, the lawyers dealt with the Hanners children through Myra Sue Hanners. Previously, on November 10, 1999, the Hanners children executed a power of attorney that authorized Myra Sue Hanners to mediate on their behalf.

According to Stanley Watson's affidavit, Watson met with Myra Sue Hanners at the Sparkman & Davison offices on Saturday, February 12, 2000, two days before the trial. Watson avers that he told Myra Sue Hanners about Anadrill's offer to settle for $900,000. He avers that Myra Sue Hanners instructed the attorneys to accept the offer on her behalf and on behalf of the children. Sparkman and Watson communicated that direction to Anadrill's counsel by a letter dated February 13, 2000.

Myra Sue Hanners and Jackie Hanners appeared at the courthouse on February 14, 2000. During the hearing, Sparkman told the court that he was concerned about the consent of one of his clients to enter a settlement with Anadrill. Accordingly, the court took a recess. During the recess, Sparkman and Watson presented a hand-written outline of the settlement terms, reflecting a payment of $900,000 by Anadrill plus $5,000 court costs and reimbursements, to Myra Sue Hanners and Jackie Hanners. The handwritten document outlined the allocation of the proceeds, including the proposed distributions to Myra Sue Hanners, Jackie Hanners, Harco Energy, the bank, and the lawyers. Myra Sue Hanners and Jackie Hanners signed the handwritten document. As previously discussed, Sparkman then made his settlement announcement in open court and on the record.

The transcript does not report whether Myra Sue Hanners or Jackie Hanners were present in the courtroom when the court entered the settlement agreement. However, Myra Sue Hanners acknowledges that she met with Watson on February 12, 2000, and that she was present at the courthouse on February 14, 2000. She also acknowledges that she signed the handwritten statement during the recess on February 14, 2000, thereby authorizing her attorneys to make the settlement in open court. However, in her affidavit Myra Sue Hanners avers that she acted hastily and involuntarily. Myra Sue Hanners also avers that she expected a subsequent formal, detailed settlement agreement with releases. Yet, Myra Sue Hanners also acknowledges that she knew the amount of the Anadrill payment, that she understood the amount of her proposed share of the distribution, and that she understood and supported the suggestion that the total settlement amount be kept confidential. She complains in her affidavit about the amount of the state court attorneys' fees.

In her deposition, Myra Sue Hanners indicates that she spoke with Jackie Hanners and her attorney before February 14, 2000. She stated that her attorney told

her about the Anadrill offer. She also stated that her attorneys told her that they were tired, had not been paid, and could not continue to represent the Hanners. Myra Sue Hanners' deposition testimony acknowledges that she appeared at the courthouse on February 14, 2000. It also indicates that she discussed the handwritten settlement document with her attorney and Jackie before she signed it. Myra Sue Hanners stated that she spoke to her children about the settlement on either February 14, 2000, or the following day. Myra Sue Hanners stated that she did not think there was a settlement because she had not signed a formal written settlement agreement.

Similarly, Jackie Hanners acknowledges that he was present at the courthouse on February 14, 2000, that he met with his attorneys, and that he signed the handwritten statement during the recess on February 14, 2000. In his affidavit, Mr. Hanners avers that, because his lawyers had threatened to withdraw if he did not agree to settle, he also acted hastily and with a sense of betrayal. Mr. Hanners avers that he expected a subsequent formal settlement agreement with releases. Mr. Hanners avers that although he knew the settlement amount, he had not agreed to the proposed distribution due to him individually. He also wanted the amount of the settlement kept confidential. Mr. Hanners also complains, in his affidavit, about the amount of the state court attorneys' fees.

The Hanners children did not appear for trial on February 14, 2000. The Hanners children all testified at deposition that they neither spoke with their attorneys nor authorized a settlement on or about February 14, 2000. In their depositions, the Hanners children state that they had no knowledge that a settlement was made in open court on February 14, 2000. Howev-

er, they acknowledge that they spoke with their mother sometime after February 14, 2000, and had the impression that a formal written settlement process would follow. The Hanners children also had the impression that their mother and uncle felt pressured to settle, as their attorneys had, they believe, threatened to withdraw from the case. There is no summary judgment evidence that the state court attorneys actually consulted directly with Jana Turner, Lisa Hill, Ronnie Hanners or Jason Hanners prior to the entry of the settlement. However, the attorneys aver that they understood that Myra Sue Hanners acted on behalf of her children, and with their authorization.

■ On the summary judgment evidence, there is no genuine issue of material fact that Myra Sue Hanners and Jackie Hanners authorized their attorneys to enter the settlement. Both concede that they consulted with their attorneys, understood the settlement amount, wanted the amount kept confidential, and signed the handwritten settlement statement at the courthouse before counsel announced the settlement on the record. Their belief that a formal settlement document with releases would follow does not inform the court's Rule 11 analysis because of the record made in open court on February 14, 2000. Similarly, their unhappiness with the attorneys' fees does not inform the Rule 11 analysis, because attorneys' fees are not an essential element of the settlement. Likewise, the distribution of the settlement proceeds among Harco, the Hanners, and their attorneys does not inform the Rule 11 analysis because that distribution is not an essential element of the settlement. Moreover, even if Jackie and Myer Sue Hanners' were distressed by their belief that their attorneys threatened to withdraw, they nevertheless approved the settlement.

■ However, on the summary judgment evidence, there is a genuine issue of material fact regarding whether the Hanners children authorized the attorneys to enter the settlement on February 14, 2000. On the one hand, there is summary judgment evidence that Myra Sue Hanners acted on her children's behalf and authorized the settlement on their behalf, and, accordingly, they did not appear for trial. On the other hand, there is summary judgment evidence that, prior to the announcement on the record, they had no knowledge of the settlement terms and had not been consulted by either their mother or by counsel.

### Ratification

The state court attorneys contend that even if they lacked authority to enter the settlement on behalf of the Hanners children on February 14, 2000, the Hanners' ratified the settlement by their subsequent conduct.

■ A principal may ratify the prior acts of an agent. *Little v. Clark*, 592 S.W.2d 61, 64 (Tex.Civ.App.—Fort Worth [2nd Dist.] 1979, writ ref'd n.r.e.). "Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act which did not then legally bind that person and which that person had the right to repudiate." *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 764 (Tex.App.—Texarkana 1992, writ denied) (citing *Kunkel v. Kunkel*, 515 S.W.2d 941, 948 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.)). For ratification, the principal must have full knowledge of the material facts. *Rourke v. Garza*, 530 S.W.2d 794, 805 (Tex.1975); *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex.Civ.App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.). The ratification may occur by affirmative acts, including conduct that is inconsistent with an intention of avoiding the prior agreement. *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d 726, 729 (Tex.App.—Texarkana 1996, writ denied). Additionally, ratification may occur through inaction, silence or acquiescence. *Weddel v. State*, 756 S.W.2d 76, 79 (Tex.App.—El Paso [8th Dist.] 1988, n.w.h.) (noting that because the principal "took no step to immediately clarify the situation and take corrective action[,] ... ratification by inaction is an appropriate characterization"); *A.B.F. Freight Systems, Inc. v. Austrian Import Service, Inc.*, 798 S.W.2d 606, 610 (Tex.App.—Dallas [5th Dist.] 1990, writ denied) (noting "[a] party may ratify a transaction by silence or acquiescence when there is a duty to speak").

The Hanners children knew that the litigation did not proceed to trial on February 14, 2000. They also knew that they did not appear for trial, but that their mother, uncle, and attorneys attended the trial setting in their stead. Myra Sue Hanners testified that she informed her children of the $900,000 Anadrill agreement on either February 14, 2000 or the following day. The Hanners children, in their depositions, acknowledge learning of the settlement from their mother in the days following February 14, 2000. In their depositions, the Hanners children suggest that their mother gave them the impression that they had little choice but to settle, because their attorneys threatened to withdraw from representing them. Nevertheless, the Hanners children did not object to the settlement. The Hanners children did not even call their attorneys to discuss the matter.

By a letter dated April 18, 2000, Joyce Lindauer, Harco's bankruptcy attorney, wrote to Jackie Hanners, Myra Sue Hanners, Jana Turner, Lisa Hill, Jason Hanners, and Ronnie Hanners. The letter discussed "the most expeditious way of getting Mr. Loveless, Mr. Jackie Hanners,

and Myra Sue Hanners (individually and as agent for all other plaintiffs) the funds of $22,484.00, $54,032.00, and $54,032.00, respectively." Lindauer's letter mentioned a procedure for obtaining a bankruptcy court order upon which Anadrill would pay the $905,000. Lindauer's letter specifically reiterated the Hanners' distributions, as well as the assertion that Myra Sue Hanners acted individually and as an agent for her children. Each of the Hanners agreed to the letter, as evidenced by their signatures under the "agreed" heading.

By a letter dated May 23, 2000, all of the Hanners signed a letter to Anadrill's counsel indicating that Lindauer would represent them in the settlement. Thereafter, Lindauer, on behalf of the Hanners and Harco, participated with other counsel in drafting a document entitled "Confidential Settlement Agreement and Mutual Release."

After the filing of the Harco bankruptcy petition, Lindauer presented the settlement to the bankruptcy court for approval. At a hearing on August 21, 2000, none of the Hanners children appeared. However, Jackie Hanners and Myra Sue Hanners appeared and requested that the court approve the settlement. Jackie Hanners testified that he signed the document entitled "Confidential Settlement Agreement and Mutual Release." Lindauer asked Jackie Hanners if he acted as the spokesman for the Hanners family. He responded that he did. Mr. Hanners then identified each family member. Lindauer asked Mr. Hanners if each family member had executed the agreement and he responded "yes." Mr. Hanners also testified that he supported the settlement.

In the course of his examination on August 21, 2000, Jackie Hanners suggested that, because their attorneys had threatened to withdraw, his family had agreed to the settlement out of duress. Nevertheless, he confirmed that Lindauer represented the Hanners regarding the settlement and that the Hanners were acting under free will, without duress, before the bankruptcy court.

Accepting for this analysis the contention that the state court attorneys did not obtain the Hanners children authorization to settle on February 14, 2000, and that Jackie Hanners and Myra Sue Hanners believed they acted under duress on February 14, 2000, the Hanners' subsequent conduct ratified the settlement agreement. The Hanners never repudiated the actions that their attorneys took on February 14, 2000. Despite their allegations of duress, they neither disavowed the settlement nor made any efforts to speak with their state court attorneys about the matter. In the subsequent months the Hanners had an opportunity to object to the settlement agreement. Instead, in April 2000, more than two months after the announced settlement, each of the Hanners approved the Lindauer procedure, as evidenced by each of their signatures under the "agreed" heading. Therefore, they expressly approved the letter, which sought to implement the terms of the original settlement agreement, with distributions to their family. Further, in May 2000 the Hanners retained Lindauer to represent them. The Hanners did not seize that opportunity to either challenge the legitimacy of the settlement agreement or their state court attorneys' lack of authority to enter the settlement agreement. Instead, they sought Lindauer's assistance in their efforts to obtain the terms of the original settlement agreement. In August 2000 they appeared in court through Jackie Hanners requesting that the bankruptcy court approve the settlement. These activities constitute affirmative acts of ratification.

As late as August 21, 2000, the Hanners family could have disavowed the settlement agreement. On August 21, 2000, Jackie Hanners appeared in federal court. Mr. Hanners stated that he appeared for the family. He had the opportunity, on behalf of the Hanners, to disavow the settlement and repudiate the February 14, 2000, actions of their counsel. Instead, even after Jackie Hanners asserted the duress contention, he urged approval of the settlement. Mr. Hanners testified that the family members had signed the settlement and requested court approval. Moreover, Myra Sue Hanners was also present in federal court that day. She also urged the court to approve the settlement. Until they raised the instant issues in their depositions on June 29, 2001, all of the family's actions supported the settlement.

There is no genuine issue of material fact regarding these actions. The Hanners ratified the acts of their attorney in open court on the record on February 14, 2000.

### Duress

■■ The Hanners have presented summary judgment evidence suggesting that Sparkman & Davison and Watson threatened to withdraw as their counsel on the eve of trial. In the course of his examination on August 21, 2000, Jackie Hanners suggested that the family had agreed to the settlement out of duress. He described his memory of the events around February 14, 2000, and believed that his attorneys would withdraw from the case, if the family did not settle. With the threatened loss of counsel, Myra Sue Hanners and Jackie Hanners assert that they felt that they were under duress to authorize the settlement on February 14, 2000.

There is no summary judgment evidence that Anadrill exercised any undue influence over the Hanners. Anadrill contends that the Hanners complaint, against their own lawyers, cannot now be used to avoid the enforcement of the settlement agreement.

The Hanners' summary judgment evidence suggests that they had a concern about the threatened attorney withdrawal since February 14, 2000. But, they took no action to address that concern. They neither discussed the matter with their attorneys nor wrote to the other parties in the litigation to disavow the settlement. Moreover, they did not complain to the state court. Indeed, even if the attorneys had acted improperly in threatening to withdraw as counsel, months later the Hanners obtained new counsel, executed letters and documents ratifying the original terms of the settlement, and then, through their uncle, and with their mother present, requested a federal bankruptcy court to approve the settlement. Therefore, by their subsequent conduct, the Hanners have ratified the settlement agreement. This is not to suggest that the Hanners may not have claims or grievances against their attorneys, if they can establish that their attorneys did indeed threaten to withdraw. Rather, even if the Hanners established their version of events at trial, they must take responsibility for their own subsequent actions and inactions. With regard to the enforcement of the settlement, the Hanners ratification amounts to a waiver of any issue of duress by their own attorneys.

Because of the ratification and waiver, the court need not conduct a trial on either the February 14, 2000, authorization or on the alleged duress issue for the bifurcated issue in this adversary proceeding.

### Orders

Based on the foregoing,

**IT IS ORDERED** that the motions for summary judgment filed by Sparkman & Davison, L.L.P., and Stanley R. Watson,

P.C., and Anadrill, a division of Schlumberger Technology Corporation, is **GRANTED.**

**IT IS FURTHER ORDERED** that the motions for summary judgment filed by Daniel Sherman, trustee; First State Bank of Mesquite; Jackie Hanners and Myra Sue Hanners; and Jana Turner, Lisa Hill, Ronnie Hanners and Jason Hanners are **DENIED.**

The court shall conduct a status conference on *November 5, 2001, at 10:30 a.m.,* following which the court will instruct the parties on the drafting of a judgment.